UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF MICHIGAN
                         SOUTHERN DIVISION


_____

JULIE PEFFER and JESSE PEFFER,

          Plaintiffs,

     v.                                    File No. 1:15-CV-78

MIKE STEPHENS, NATHAN EDWARDS,
and JASON COON,

          Defendants.
_____/


                  <u>Hearing re:  Defendants' Motions</u>
                      <u>for Summary Judgment</u>


Before


              THE HONORABLE GORDON J. QUIST
                 United States District Judge
                      July 28, 2016


Digital audio recording transcribed by:

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter

APPEARANCES


J. NICHOLAS BOSTIC                    LISA J. VOGLER
909 N. Washington Ave.                57 N. Michigan Ave.
Lansing, MI 48906                     Beulah, MI 49617
Attorney for Plaintiffs               Attorney for Defendant
                                      Nathan Edwards



SANDRA J. DENSHAM                     JOSEPH T. FROEHLICH
333 Bridge St., NW                    Assistant Attorney General
Suite 530                             P.O. Box 30736
Grand Rapids, MI 49501                Lansing, MI 48909
Attorney for Defendant                Attorney for Defendant
Jason Coon                            Mike Stephens

```
 1                                  Grand Rapids, Michigan
 2                                  July 28, 2016
 3                                  1:58 p.m.
 4                            -     -     -
 5
 6                  P R O C E E D I N G S
 7
 8          THE COURT:  Julie and Jesse Peffer against Mike
 9  Stephens and others, docket number 1:15-CV-78, time set for
10  oral argument on motions for summary judgment by all the
11  defendants.  Can I have the appearance of counsel, please?
12          MR. BOSTIC:  Good afternoon, Your Honor.  Nick
13  Bostic on behalf of Mr. and Mrs. Peffer who are seated here at
14  counsel table.
15          THE COURT:  Thank you.
16          MS. VOGLER:  May it please the Court, Lisa Vogler on
17  behalf of Nathan Edwards.
18          THE COURT:  Okay.
19          MR. FROEHLICH:  Good afternoon, Your Honor.  Joe
20  Froehlich appearing on behalf of Detective/Sergeant Stephens.
21          THE COURT:  Thank you.
22          MS. DENSHAM:  Good afternoon, Your Honor.  Sandra
23  Densham appearing on behalf of Defendant Jason Coon.
24          THE COURT:  Thank you.
25          Counsel, let me tell you I have laryngitis.  You
```

1    probably have noticed it, and it gets worse -- the more I

2    talk, it gets worse, so I'm not going to participate like I

3    usually do with a lot of questions and all that.  But let me

4    tell you I've spent a considerable amount of time on the case

5    and I will tell you what my tentative conclusions are, and I

6    don't have to read my own writing because I now have a

7    computer that prints it as I dictate it.

8             Regarding Count 1, that's the count that -- I'll

9    just use your first names if you don't mind so that it will

10   just make it easier for everybody.  Julie alleges that

11   Defendant Jason Coon violated the rights of Julie by searching

12   her purse on June 13, 2012.  Mr. Coon concedes that there's a

13   factual dispute as to whether he ever searched the purse.  Ms.

14   Peffer, Julie Peffer said that he did.  Coon said he didn't

15   and the police report backs Coon's version, but there's still

16   an issue of fact as to whether he searched the purse.

17            My tentative conclusion there is that Coon's

18   reliance upon the fact that Jesse had been arrested does not

19   justify the search of Julie's purse.  I'll go into it in a

20   little bit more detail about it.  Cases that were cited where

21   the officer made a search during criminal activity do not

22   support Coon's position in that regard.  There was no report

23   from third parties, no reasonable suspicion regarding any

24   criminal activity on behalf of Julie.  That's where I'm coming

25   from.  I've got more detail about it.

1          Regarding Count 2, that's a claim brought by Julie

2     again.  She alleges that Jason Coon unlawfully seized her cash

3     in the amount of $1,757 without a warrant and without probable

4     cause.  Mr. Coon argues that the claim regarding the cash is

5     barred by the doctrine of collateral estoppel or what is

6     called claim preclusion.

7          That doesn't stand up in my judgment.  That argument

8     at least doesn't stand up under Michigan law which does not

9     give collateral estoppel effect to consent judgments.  One

10    case in that regard is American Mutual Liability Insurance

11    Company against Michigan Mutual Liability Company, 64 Mich App

12    315, on the Westlaw printout particularly Page 7.  And it's

13    also picked up, by the way, in a federal court, and that is

14    Corey against Corey, 212 Westlaw 5945164, Eastern District of

15    Michigan Bankruptcy Court, on Page 5 of that opinion.

16         The Rooker-Feldman doctrine doesn't help Coon in

17    that regard.  That applies only to when the plaintiff

18    complains of injury from the state court judgment.  Here Julie

19    is not complaining about injury from the state court

20    judgment.  She's complaining about injury arising from the

21    seizure of the cash.  I refer the parties to Exxon Mobil

22    Corporation against Saudi Basic Industries Corp., 544 U.S.

23    280, 125 S. Ct. 1517, 2005.

24         Count 3, Jesse alleges -- you're taking good notes

25    here, everybody?  Okay.  Am I going to fast?  I am going to

1    fast?

2              MS. VOGLER:  No, you're fine, Your Honor.

3              THE COURT:  Okay.  Count 3, Jesse alleges that Mr.

4    Coon seized his telephone without a warrant and unlawfully

5    searched the contents of the telephone without a warrant to

6    locate the telephone numbers of the plaintiff, Julie Peffer.

7    Jason Coon alleges he had reasonable expectation of privacy in

8    the telephone and the telephone numbers he called.

9              This claim in my judgment is barred by the doctrine

10   of qualified immunity.  Events here occurred in June 2012.  As

11   stated by the judge in United States v. Gholston, 993 F. Supp.

12   2d 704, 711, Eastern District of Michigan, the legality of a

13   warrantless search -- searches of cell phones incident to

14   arrest remains a point of discussion and disagreement among

15   the courts and an open question in the Sixth Circuit, but it

16   was decided that such searches would be illegal in Riley v.

17   California by the United States Supreme Court.  That's 134 S.

18   Ct. 2473, 2488-92, 2014, which held that the police may not

19   search the cell phone of an arrestee without a warrant.  The

20   problem with any reliance on that case, it came after the

21   search, so you didn't have any Sixth Circuit law and you

22   didn't have any Supreme Court decision that would make it

23   clearly illegal, so I would dismiss that count.

24             Regarding Counts 4 and 5, these are counts in which

25   Jesse alleges that the Defendant Mike Stephens swore to facts

1    in an affidavit requesting the search warrant for the entire

2    dwelling at Bierri Road, Reed City.  It's alleged that the

3    affidavit failed to establish any connection between the

4    flyers and the plaintiffs' dwelling.  The alleged affidavit

5    also states there was no nexus or probable cause -- the

6    alleged argument is that there was no nexus or probable cause

7    to show anything illegal going on in the residence.  The

8    search of the residence was therefore unreasonable and a

9    violation of the Fourth Amendment of the Constitution.  This

10   is a search that occurred I think in July of 2014.  But the

11   rationale also applies to Count 5 because both go to the

12   validity of the warrant.

13           Without going into all the detail, I would dismiss

14   those counts because the argument really goes to the issue

15   that the conclusion was wrong by apparently the magistrate or

16   the district judge, whoever, and the officer, but there's no

17   allegation that I saw that there were any lies in the

18   affidavit or anything that was unreasonable, and then he would

19   have a reasonable basis to rely on an affidavit -- I mean, on

20   the warrant issued by the appropriate court officer, which

21   happened here.  So that goes to Counts 4 and 5.  Count 5

22   alleges that Mr. Stephens seized personal property belonging

23   to the plaintiffs without probable cause and without exception

24   to the Fourth Amendment.

25           Counts 6 and 7 allege common law conversion from

1    retention of the cell phone and bond money in 2012.  This

2    count alleges total damages, this is Count 6 now, of $665.

3    The defendant is Mr. Coon.  And then in Count 7 Jesse alleges

4    conversion of a cell phone and bond money in 2012.  Once again

5    the defendant is Jason Coon.

6         There was a resolution of the criminal case pending

7    against Jesse Peffer, but his bond money and cell phone were

8    not returned.  Apparently the items have now been returned.

9    But in any event I would dismiss the case, those claims,

10   because it's undisputed that Mr. Coon left the Sheriff's

11   Office, Sheriff's Central Michigan Enforcement Team, in 2013,

12   and there was no allegation that he personally possessed the

13   money or cell phone at the time of the alleged conversion.

14        In addition, he's entitled to governmental immunity

15   on the conversion claim.  First, the acts were undertaken

16   during the course of his employment.  Two, he performed the

17   acts in good faith and without malice.  And three, the acts

18   were discretionary as distinguished from ministerial, and he

19   fails to show any facts that Coon acted with malice.

20        Regarding Count 8, Jesse alleges that after the

21   search warrant in 2012 many items of property were not

22   returned.  The count is against Nathan Edwards.  It's

23   undisputed that Edwards did not execute the search warrant,

24   and even if he had, the property by state law is in the

25   custody of the seizing agency.  That's Michigan Compiled Laws

1    Section 333.7532(2), and I'll just cite M.C.L. which I think

2    was cited by the plaintiffs, Section 780.655 which governs an

3    officer in the execution of a search warrant regarding the

4    property or things covered by a search warrant, but it's the

5    seizing agency under the prior statute, not the officer in

6    this case, that is responsible for retaining those things.

7              Regarding the count for exemplary damages, I don't

8    see that's a separate count.  It doesn't allege a separate

9    claim.  It alleges a form of relief.  In other words, I think

10   that you're not in your -- Mr. Bostic, I think that's what you

11   put in a prayer for relief as distinguished from a count.

12             Okay.  That's where I'm coming from.  I can go in a

13   little detail.  Once I make the final decision, I will.  Is my

14   voice coming back or is it going away?  Mr. Bostic and I know

15   each other quite well, so --

16             MR. BOSTIC:  You're at about 50 to 60 percent.

17             THE COURT:  Sixty, okay.  I'm losing it here.  But

18   anyway, how do you want to proceed?  In other words, right now

19   the defendants are ahead except for Counts 1 and 2.  So, Ms.

20   Dersham (sic) why don't you go ahead and tell me why I'm

21   wrong.

22             MS. DENSHAM:  Thank you, Your Honor.

23             THE COURT:  There's a lot here.  That's why I have

24   to read my writing here -- not my writing, my typing.

25             MS. DENSHAM:  Well, if I recorded the Court's

1    comments correctly with respect to Count 1, the Court found a

2    factual dispute with respect to whether Defendant Coon

3    actually executed the search or whether it was the other

4    officer there.  I would just rely on our reply brief,

5    specifically Page 2, the Supreme Court's ruling in the <u>Scott</u>

6    case, where the Court stressed there that there must be a

7    genuine issue of fact.  There can be disputes, but in this

8    case with --

9            THE COURT:  Yeah, but in <u>Scott</u> they had a videotape

10   depicting the actual facts and here you don't have that.  Here

11   you have on the one hand and on the other hand, and that makes

12   it a jury issue.

13           MS. DENSHAM:  For the record, Your Honor, I would --

14           THE COURT:  But there's a videotape in <u>Scott</u>.

15           MS. DENSHAM:  I'm sorry?

16           THE COURT:  I think there was a videotape in <u>Scott</u>

17   that couldn't be denied.

18           MS. DENSHAM:  And I'm not -- I don't know that, Your

19   Honor.  I just -- in this case we're just -- we're relying on

20   the fact that at the time contemporaneous with how all these

21   events went down, Trooper Frayre submitted his report where he

22   stated that he obtained consent from Julie Peffer in regards

23   of whether there was consent or not.  He stated that he

24   searched her purse.  And the only person who says that my

25   client, Jason Coon, searched Ms. Peffer's purse was Ms. Peffer

1    who had never met --

2         THE COURT:  Yeah, but that's not an argument on a

3    motion for summary judgment.  I have to take all the facts in

4    the light most favorable to the party opposing the motion.

5         MS. DENSHAM:  All right.

6         THE COURT:  Unless they're clearly, you know, crazy,

7    like the world is flat, or the other case I used to get all

8    the time from a particular lady that she was assaulted by Bill

9    Clinton at the hotel across the street.  That kind of thing we

10   can ignore.  But when you have witnesses that were both at the

11   point -- you can have ten witnesses.  It wouldn't make any

12   difference.  If she says that, you know, it was your client,

13   that's it.

14        MS. DENSHAM:  All right.  Your Honor, I'll move on

15   then just to -- presuming in the light most favorable to the

16   plaintiffs that it was Defendant Coon who executed the search,

17   he had a reasonable basis to do so in fact under all of the

18   circumstances of the arrest of Ms. Peffer's husband and just

19   ascertaining whether there was any weapons or any drugs in her

20   purse.  And I think even Ms. Peffer conceded that when the

21   search was conducted, she presumed it was for a search of

22   weapons or drugs, and it wasn't until after she opened her

23   purse more to obtain her driver's license and the cash was in

24   plain view that the cash was seized at that time.

25        THE COURT:  Well, I think -- yeah, I think now

1   you're getting there, but it's a close question.  There's

2   nothing really to tie the wife in to drug dealing, and the

3   only reason that they could have -- the only legal reason that

4   they could have searched the purse at that point in time with

5   no warrant or anything would be to protect themselves in case

6   they had a suspicion or a reasonable basis to believe that she

7   had some kind of weapon that would interfere with it.  But

8   anyway, I got your point.

9          MS. DENSHAM:  All right.  And I think when you say

10   the only reason, I think that that is -- it may be, you know,

11   the only reason, but it certainly is a very important reason

12   and one that is routinely exercised by law enforcement

13   officers in situations such as this, especially when there's a

14   spouse who's on the scene, not just some uninterested

15   passerby.

16          THE COURT:  I understand.

17          MS. DENSHAM:  And then with respect to the seizure

18   of the cash, if I'm understanding the Court's reasoning, the

19   Court cited a couple of cases, and we would just rely on the

20   arguments --

21          THE COURT:  Okay.

22          MS. DENSHAM:  -- in our brief in that respect.  I

23   have not read the cases that the Court cited, so I don't have

24   anything more to offer at that point other than the arguments

25   in our brief and the fact that that was in plain view and

```
 1    seized at that time.  And I don't have anything else unless
 2    the Court has questions.
 3              THE COURT:  Not right now.
 4              MS. DENSHAM:  All right.  Thank you, Your Honor.
 5              THE COURT:  Thank you very much, ma'am.
 6              Mr. Bogren?  I don't think I'm wrong on much of
 7    this, Mr. Bogren.
 8              MS. DENSHAM:  I'm sorry?
 9              MR. BOSTIC:  You called me Bogren, so Mike has been
10    insulted.
11              THE COURT:  Mr. Bostic.
12              MR. BOSTIC:  Your Honor, in --
13              THE COURT:  I miss Mr. Bogren.  Tell him I miss him
14    there, Ms. Dersham.
15              MS. DENSHAM:  I will let him know that.
16              THE COURT:  I see these two guys together once in a
17    while.
18              MR. BOSTIC:  Just in rebuttal to her comments
19    concerning the purse --
20              THE COURT:  Don't argue it.  I'm --
21              MR. BOSTIC:  Don't need to, okay.
22              THE COURT:  All right.
23              MR. BOSTIC:  In terms of the qualified immunity for
24    the search of the phone, I certainly understand the Court's
25    point and the fact that Riley came out in 2014.  But I wanted
```

1    to take the Court back one step further, and I put some of

2    these things in my brief that we obtained during discovery

3    where Mr. Coon acknowledged that the investigation was getting

4    rather sketchy because Mr. Peffer was going places they didn't

5    anticipate.  There was almost an hour delay where he went back

6    home after the meeting at the restaurant and they had to call

7    the informant to decide if the deal was even still going to go

8    down, and at his deposition he expressed some reservation as

9    to whether they even had a case.

10             THE COURT:  What about what was on the phone?

11   That's really what, you know, the case goes to.  In other

12   words, my recollection is they got the number of his home and

13   they called Julie because they got the number and whatever

14   else they looked at on the phone.  You're not arguing that --

15   well, yeah, what is -- it's the confiscation of the phone

16   you're talking about, not the numbers?

17             MR. BOSTIC:  Not the confiscation.

18             THE COURT:  Not the confiscation?

19             MR. BOSTIC:  No.

20             THE COURT:  That's what I thought you were -- I

21   didn't think you were, but I thought you were changing it here

22   right now.

23             MR. BOSTIC:  The search of the contents of the phone

24   is what the claim is about, I think, but my --

25             THE COURT:  Yeah, that's what I thought it was

1      about.

2            MR. BOSTIC:  Mr. Coon -- and I pointblank asked him,

3      I said, Well, if you have hesitation as to whether you had

4      probable cause to continue and make the arrest, doesn't that

5      same hesitation apply to the search of the phone or the

6      seizure of the money?  I don't remember which of the two, but

7      during his deposition he acknowledged some concern as to

8      whether the deal was going to be completed.

9            THE COURT:  Yeah, but you have to have a clear case

10     from the United States Supreme Court and Sixth Circuit.  I'm

11     talking about qualified immunity.

12           MR. BOSTIC:  Right, but I'm talking about lack of

13     probable cause to even seize it or make the arrest and make

14     the stop initially.  Now, we're not challenging those, but my

15     point is he acknowledged to some degree some hesitation on his

16     part and lack of confidence in his case.

17            So that's my only point that I would like to make in

18     terms of, you know, the phone.  A case involving the phone

19     itself, I agree.  We didn't get Riley until 2014, and I agree

20     that there was -- it was back and forth in the Sixth Circuit

21     in 2012.  But going back further, that there had to be

22     probable cause in the first instance regardless of the type of

23     container you're searching.  That would be my reliance.

24            THE COURT:  You're not done yet.  You get to talk

25     now and tell me why I'm wrong on all the other counts.

1          MR. BOSTIC:  Oh, okay.  I'll start with Mr.
2     Stephens, the detective that --
3          THE COURT:  Okay.  Count 4 and 5?
4          MR. BOSTIC:  Count 4 and 5, who executed the search
5     warrant in 2014 in what we're labeling retaliation because
6     they weren't happy with the deal that Mr. Peffer got a few
7     weeks earlier.  The --
8          THE COURT:  Well, maybe they can take the deal back.
9          MR. BOSTIC:  Well, they let the 21 days to appeal
10    expire.  The Court's comments focused on an inability to find
11    any particular false statements in the affidavit.
12         THE COURT:  Right.
13         MR. BOSTIC:  I spent a lot of time on the brief
14    going back through and criticizing and challenging the
15    detective's conclusions as to the importance of things.  I
16    don't need to reiterate that.  I know you've seen how I
17    approached trying to convince you that he should have known
18    better.
19         He should have known that he was misleading the
20    magistrate with some of those conclusions, particularly the
21    post office issue.  I mean, the zip code representation is
22    just wrong, and then the conclusion, his conclusion that there
23    was consistency between the 2013 letters and the 2014
24    flyers --
25         THE COURT:  But here's the problem.  You're

1    criticizing him and he put -- he didn't lie in any of the

2    affidavits.  You agree he didn't lie in his affidavit?

3              MR. BOSTIC:  No.

4              THE COURT:  You don't agree?

5              MR. BOSTIC:  I do not.

6              THE COURT:  All right.

7              MR. BOSTIC:  Especially with the post office issue.

8              THE COURT:  Tell me what -- tell me the facts that

9    are wrong in that.  I've got it marked here.

10             MR. BOSTIC:  He alleged that the Grand Rapids post

11   office was the central sorting facility for post office

12   numbers beginning in 494, but Big Rapids is 493.  Now, I don't

13   think he specifically represented in the affidavit that Big

14   Rapids was 493, and frankly I think he left it out.  Well,

15   that's a huge omission.  He let that magistrate believe that

16   because of the zip code issue, there was some direct

17   connection between those flyers and Mr. Peffer or at least

18   Mr. Peffer's residence.  That's simply not true.  Now, Big

19   Rapids mail may in fact be sorted in Grand Rapids, but my

20   point is the representation about the zip code connection was

21   very misleading.

22             THE COURT:  I don't get it.  I live in Grand Rapids

23   and my zip code is 495 and then, you know, then a lot of

24   numbers.  I used to live in Grand Haven and it would be sent

25   from Grand Rapids and I would get a Grand Rapids postal stamp

```
1     on there.  And I have a -- or had a house up in Ludington on
2     the lake and that zip code is almost like Spring Lake's zip
3     code.  You just trade the last couple numbers, but they're all
4     49 something.
5               MR. BOSTIC:  Right.  I mean, we have 48 in one half
6     of the state and 49 on the other half of the state.
7               THE COURT:  That's to get something there, but once
8     they get to the post office after you mail it, they just stamp
9     it Grand Rapids.  They're all accumulated.
10              MR. BOSTIC:  Right, and us non-postal employees, we
11    don't know.  There's a lot about how that mail is shipped
12    around the state that we don't know.  But he gave the
13    impression that he did know, and he doesn't and he was wrong.
14              THE COURT:  Okay.
15              MR. BOSTIC:  Another false statement is his
16    statement that the 2013 letters and the 2014 flyers all
17    appeared to have some similar characteristic or
18    characteristics or be generated by the same mechanism or the
19    same person, and I went into a lot of detail, Your Honor, in
20    the brief and I don't need to repeat it here.  But that's
21    another point where we would disagree with the Court on the
22    misleading nature of the allegations in the affidavit.
23              Those are the two primary ones that come to mind.
24    There was a day when I could keep three cases straight in my
25    head, but that day is not today.  It was years ago.
```

1          In terms of the seizures, I agree that the things

2    seized were -- I mean, I'm troubled by the generality of the

3    warrant, the description, but if the Court's going to uphold

4    the warrant in terms of its probable cause, I don't -- that's

5    not going to get me anywhere.  But the last thing that I would

6    like to discuss there is nexus.

7          THE COURT:  Is what?

8          MR. BOSTIC:  The nexus between the alleged criminal

9    activity that Mr. Stephens claims he thought Jesse was

10   engaging in and the dwelling.  I went in great detail in my

11   brief outlining the three crimes that Mr. Stephens claims he

12   thought occurred, and he told me what they were and then I

13   broke the elements down under state law for the Court.  He

14   didn't satisfy any of the elements of any of the three crimes

15   he identified.

16         Be that as it may, assuming it was close enough for

17   purposes of probable cause, there's nothing in that affidavit

18   that suggests Julie or Jesse Peffer owned a printer, had a

19   printer, a computer, or that Jesse would have done any of this

20   at his home.  So the second huge defect in that affidavit is

21   the lack of nexus.

22         So even if you find probable cause and even if you

23   find that he didn't lie, he didn't do anything, and I just

24   read -- in prepping for today I'm looking through the defense

25   brief, and they don't try to justify the lack of nexus.  They

1    simply stop with the notion that it was Jesse Peffer's

2    residence.  And I mean I put a couple of pages' worth of case

3    citations and explanations that that is not enough in this

4    circuit.

5              THE COURT:  What do you do with the good faith

6    exception?

7              MR. BOSTIC:  He's the investigator.  He's the one

8    that obtained the warrant, and he's the one --

9              THE COURT:  But that's the whole point.  He obtained

10   the warrant.

11             MR. BOSTIC:  He executed the warrant and he knew the

12   face of that warrant had no nexus as required by the Fourth

13   Amendment.  It's not like another officer gave him information

14   or as with Mr. Edwards --

15             THE COURT:  How would you expect him to know that

16   there wasn't -- that your client didn't have a printer?  I

17   mean, how much does he have to know?  I understand your

18   argument, but it's not a blatant misrepresentation in my

19   mind.  What you're saying is he should have given more detail.

20             MR. BOSTIC:  He should -- well, yes, but I'm talking

21   about nexus.  He should have put anything in there to show how

22   the crimes that he thought were occurring occurred from that

23   location.  They could have occurred --

24             THE COURT:  We're talking by each other.  I keep

25   saying you don't like the affidavit.

1          MR. BOSTIC:  True.

2          THE COURT:  You're saying that there was not enough

3    information in there, that there was a couple of misleading

4    things, and you've come up with two things, the zip code and

5    the -- he didn't know anything about a printer.  All right.  I

6    don't know about the zip code because I don't know what zip

7    codes we're talking about, but he gives it to a magistrate or

8    a district judge, whatever, and that judge signs it.  That's

9    good enough for me.

10         So now you're down, it seems to me, to the zip

11   code.  Was that intentionally misleading or was it a gross

12   error of some kind?  No one's going to know whether he's got a

13   printer in his house.  You would assume so.  I mean, you know,

14   most of us do now.

15         MR. BOSTIC:  But I was -- I sort of went back to

16   talking about -- complaining about the warrant, but that's

17   because you asked me how do I address good faith, and that's

18   what I was getting at was that the face of the warrant has no

19   nexus.

20         THE COURT:  Okay.  Conversion?

21         MR. BOSTIC:  I was looking to see if I had to say

22   anything else about Mr. Stephens and I --

23         THE COURT:  No, no, go ahead.  You can go right

24   ahead.

25         MR. BOSTIC:  You summed it up.  I don't like the

1    affidavit.

2              THE COURT:  Yeah.  No, but now go on to -- I thought

3    you had some common law counts and a statutory count regarding

4    conversion.  I'm giving you -- I've told you where I'm coming

5    from.

6              MR. BOSTIC:  Yes.

7              THE COURT:  And what I'm doing here is giving those

8    that disagree with me an opportunity to tell me why I'm wrong.

9              MR. BOSTIC:  Yes.  The reason I think you're wrong

10   on Edwards as to the seizure and the conversion is because

11   333.7532, sub (2), applies in a forfeiture context, and there

12   was no forfeiture when the demand for return of the property

13   was made, and in fact there could no longer be because the

14   statute of limitations had expired.  So the problem here --

15   and I laid this out in my brief as to why I think it's

16   important that the affiant be the one responsible.

17             A member of the executive branch gets permission

18   from a member of the judicial branch to kick in a door and

19   take property and invade a private dwelling.  That's very

20   significant.  I mean, it's burglary if it's done by anybody

21   else.

22             And then we could have an officer in Grand Rapids

23   who needs a search warrant executed in the Upper Peninsula.

24   He sends it to a police officer up there, they take some

25   property and they package it up and mail it back to Grand

1    Rapids.  Then they turn that evidence over to the FBI.  The

2    citizen has no recourse except to the affiant.

3              And in the Criminal Procedure Codes, 780.656 and

4    657, I think it is, if the legislature would have wanted to

5    treat seized property as being the property of the entity that

6    employed the affiant, they could have put in the exact same

7    language that they put in the forfeiture code, but they

8    didn't.

9              THE COURT:  Okay.

10             MR. BOSTIC:  We've given you some basis under state

11   law where the responsibility for the return and custody goes

12   back to the officer, the seizing officer, which those cases do

13   say the seizing officer, and I have to stand here and

14   acknowledge that from everything we can determine, Mr. Edwards

15   was not the seizing officer.  But again, they can do five

16   search warrants at one time and send them out to various other

17   agencies to be executed all at once.  The affiant can't be

18   everywhere.  So the only common denominator for accountability

19   is back to the affiant.

20             THE COURT:  Would you agree he didn't seize the

21   property himself, he just did the affidavit?

22             MR. BOSTIC:  I agree I can't prove he seized it.  I

23   mean, you know, I have to admit that.

24             And there's a state court judge that has ruled that

25   one of the drug teams similar to this one is a governmental

1    entity.  She looked at the way they do their business, the way

2    they do their finances, how their board operates, and

3    determined that they were to be treated as a municipality for

4    purposes of suing and being sued.  That's not happened to all

5    the teams and there are a couple of different configurations

6    that they use for their intergovernmental agreements, but you

7    can see the problem is what is the entity.  You have all of

8    the individual agencies submitting people to these teams and

9    the team itself may or may not be an entity.

10          So when it comes to accountability, I mean, the

11   courts want -- I know the courts are interested in making sure

12   that property that is seized after they've allowed this is

13   accounted for.  And the best way and the only way under

14   Michigan law to do that is toward the affiant.

15          THE COURT:  Have you had any case where that was,

16   you know, the factual situation?  You mentioned a district

17   court, I think, case.  With these exact facts?

18          MR. BOSTIC:  No.  The closest ones I have are the

19   ones out of the eastern side in state court.  One of them

20   might have been out of the Eastern District of Michigan where

21   the liability for return of the property went back to the

22   seizing officers, and I'm almost positive those cases said

23   seizing officers.  Now, they happened to be the affiant, you

24   know, but the case said seizing officer, and those are --

25          THE COURT:  How do they even -- they don't even have

1    custody of it after they bring it in.

2            MR. BOSTIC:   Right.   It's logged in, it's put in the

3    evidence room, and sometimes the officers themselves, the

4    staff officers can't even get into the evidence room without

5    the sergeant or the lieutenant of the team.   I agree, Your

6    Honor.   But my point is in terms of accountability, once the

7    police seize this property, the only direct recourse the Court

8    has is back to the one person that the Court gave authority to

9    to go take it in the first place.

10           THE COURT:   Well, your client as I understand it did

11   ask for the property back eventually and got it.

12           MR. BOSTIC:   The Edwards, yes.   Yes.   The Coon cell

13   phone and money, no.

14           THE COURT:   Well, yeah.   That was done pursuant to

15   the settlement basically, wasn't it?

16           MR. BOSTIC:   No.   That was Julie's money.   That was

17   the $1,700.   The money and the phone taken from Jesse by Mr.

18   Coon is the other conversion count.   To this day we don't have

19   that property back.

20           THE COURT:   Okay.   Okay.

21           MR. BOSTIC:   I think that sums up -- I mean, I

22   had -- you laid out your thoughts and I've addressed them

23   directly, and my brief I think goes into a lot more detail and

24   probably says some things I forgot, but I think I've made my

25   record.

1          THE COURT:  Thank you.  Okay.  Let me just check

2    things here a minute.

3          All right.  We heard from Ms. Dersham.

4          MS. DENSHAM:  Densham.

5          THE COURT:  Densham?

6          MS. DENSHAM:  Densham, yes.

7          THE COURT:  Tell me, because I've got D-r-s-h-a-m,

8    it looks like.

9          MS. DENSHAM:  It's D-e-n-s-h-a-m.

10         THE COURT:  Densham?

11         MS. DENSHAM:  Densham.

12         THE COURT:  Gotcha, okay.

13         Ms. Vogler, why don't you go for Mr. Edwards.

14         MS. VOGLER:  Thank you, Your Honor.

15         If I can clarify and understand what the Court's

16   initial comments were, it said as a matter of law Nate Edwards

17   did not commit common law conversion.

18         THE COURT:  That's what I said.

19         MS. VOGLER:  Yes, and that the statutes are clear

20   that an author of a search warrant and a search warrant

21   affidavit by those acts alone does not commit conversion.

22         THE COURT:  That's what I said, but then Mr. Bostic

23   stood up.

24         MS. VOGLER:  Yes, sir.  And the statute that Mr.

25   Bostic and the plaintiffs are relying on is 780.655 which is a

1    criminal procedural statute, and the distinction in the case

2    law that was raised by Mr. Bostic is simply that, and I've

3    read those cases, is that those cases do not involve a search

4    warrant being issued and then executed upon.  Those were

5    seizing officers who were at a scene or at a site and seized

6    and then were held responsible for transporting that property

7    that they seized pursuant to probable cause without a warrant

8    being issued, and then later that property was retained by

9    them and logged in by that officer.  That's the definition in

10   the case law of the officer.

11          Clearly in this case Mr. Edwards -- Detective

12   Edwards did not execute, and the word "execute" is used in

13   780.655, he did not execute the search warrant that he

14   authored.  So that's the factual distinction here.

15          So there's two bases to dismiss plaintiffs' Count 8

16   against Nate Edwards.  The facts are not consistent under any

17   construction in Michigan law of common law conversion; and

18   secondly, the property was seized pursuant to a lawfully

19   statutorily authorized search warrant.  There's no allegation

20   that there was no probable cause for the search warrant.

21   There's no allegation against Detective Edwards that anything

22   was untruthful or misleading in the affidavit or the search

23   warrant itself.  So our argument is simple.  As a matter of

24   fact and as a matter of law, there is no basis for a claim of

25   common law conversion.

1          And even if there were, Detective Edwards is

2    entitled to qualified immunity.  There is no material issue of

3    fact raised by the plaintiff in response to our motion that

4    can establish or refute any of the elements under <u>Odom</u>.

5    They're clear.  No malice.  They never met Detective Edwards.

6    I asked them at their deposition, Any reason to believe he had

7    ill will or malice towards you?  No.  No.  Admissions of the

8    plaintiffs.

9          So, Your Honor, that's our position in response to

10   the plaintiffs' comments today.  I understand the Court didn't

11   feel the need in your initial comments to go to the issue of

12   qualified immunity, but perhaps in light of what Mr. Bostic

13   stated, even if you were to assume --

14          THE COURT:  Well, that's something if it goes on

15   appeal you can take up with the appellate court if I rule in

16   your favor.

17          MS. VOGLER:  Right, yeah.  But our argument is even

18   if you assume that there is a factual and/or legal basis for

19   common law conversion, he's still entitled to qualified

20   immunity and that would dismiss the count in and of itself.

21          THE COURT:  All right.  Thank you.

22          MS. VOGLER:  Thank you.

23          THE COURT:  Okay.  Next we have Mr. Froehlich.

24          MR. FROEHLICH:  Yes, Your Honor, thank you.  Joe

25   Froehlich for Detective Stephens.

1          THE COURT:  Okay.

2          MR. FROEHLICH:  On Mr. Bostic's second point

3    regarding the facial validity of this warrant, what he has to

4    show to overcome the warrant is that no reasonable officer

5    would have ever relied on it, and I think that's a tough row

6    to hoe.  The affidavit laid out this is why I think Mr. Peffer

7    was engaged in this activity.  This is where he lives.  This

8    is how I think they're being produced.  I think it's being

9    produced at his house.  I don't see how it's so lacking that

10   no one would have ever relied on it.

11         Then the other point about misrepresentations or

12   omissions, one thing that Mr. Bostic didn't talk about is it's

13   not just a misrepresentation or omission.  It has to be a

14   misrepresentation or an omission made with the intent to

15   mislead, and there's just no evidence of that.

16         And even if there was a misrepresentation about this

17   post office issue, take it out.  Take out the statement of Mr.

18   Stephens that this was postmarked Grand Rapids and Grand

19   Rapids is the central sorting facility.  Probable cause still

20   exists without that statement.  And if it's -- I don't see how

21   it's an omission when it's an affirmative statement.

22         And then about the differences between the flyers,

23   while there may have been a difference in the form of these

24   flyers and mailings, the substance was certainly the same,

25   being, Hey, I'm a police officer, I want you to know that Tom

1    Beemer is a snitch, with the purpose of intimidating Mr.

2    Beemer, which is unlawful.  If these were done for anything,

3    it was to intimidate Mr. Beemer to prevent him from continuing

4    to -- as a confidential informant.  So I don't know if you

5    have any other questions for me.

6              THE COURT:  No, I don't.  Thank you.

7              MR. FROEHLICH:  Thank you, Your Honor.

8              THE COURT:  Well, anybody with any rebuttal?  Mr.

9    Bostic?

10             MS. DENSHAM:  No, Your Honor.

11             THE COURT:  Okay.  Mr. Bostic, any rebuttal to

12   this?

13             MR. BOSTIC:  Very little, Your Honor, but yes.

14             Regarding Mr. Stephens, he was on the case for about

15   24 hours.  Throughout the brief he claims he did a competent

16   and thorough investigation.  It was 24 hours' worth at best.

17   He got a call from the lieutenant at CMET who spewed his

18   beliefs as to who was responsible and he reacted the next day

19   with a search warrant.

20             He claims that he reviewed the case file that had

21   reports from Trooper Glentz that talked about no fingerprints

22   and listed other suspects.  He had the report from Detective

23   West of Big Rapids Police Department which listed all four

24   people that Mr. Beemer had informed on, and he completely

25   disregarded all that.  He went back to the prosecutor's office

1    that had disqualified itself to get his warrant.  So in

2    balance, Your Honor, I think there are things there that

3    create a jury question.

4            THE COURT:  All right.

5            Well, regarding Count 1, I'm going to pretty well

6    stick with what I said before, and I've already read what that

7    count is about.  In <u>Scott v. Harris</u>, 550 U.S. 372, 127 S. Ct.

8    1769, 2007, there was a videotape depicting the events that

9    clearly contradicted plaintiff's version of events.  There's

10   no such evidence here.

11           There is a dispute over the evidence as to Mr. Coon

12   being concerned about whether Julie Peffer was armed.  The

13   police officer must point to specific facts from which a

14   reasonable inference of her being armed could be drawn.  The

15   purpose of the search would be to allow the officer to go

16   about his business without harm to anyone, not to find

17   evidence of a crime.  That's <u>Adams against Williams</u>, 407 U.S.

18   143, 146; 92 S. Ct. 1921 at 1923, 1972.

19           In my judgment Mr. Coon's reliance upon the fact

20   that Jesse had just been arrested does not justify the search

21   of Julie's purse.  Cases where the officer made a search

22   during criminal activity do not support his position as well.

23   There was no report from third parties and no reasonable

24   suspicion regarding any criminal activity on behalf of Julie

25   Peffer.

1          Count 2 which I've already described, the problem

2    with Mr. Coon's argument is that Michigan law does not give

3    collateral estoppel effect to consent judgments.  American

4    Mutual Liability Insurance Company against Michigan Mutual

5    Liability Company, 235 N.W.2d 769, 64 Mich App 315, 1975.  A

6    consent judgment reflects the agreement of the parties, and

7    the judge's approval is simply ministerial.

8          The plain view doctrine does not help Mr. Coon

9    because the object's incriminating character must be

10   immediately apparent.  For example, in United States v.

11   $99,999 In United States Currency, 69 F. App'x 757, 765, Sixth

12   Circuit, 2003, the Court said fifteen to twenty thousand

13   dollars standing alone is hardly enough cash to justify the

14   search.  The Court held that $4,000 found in a motel room

15   raised not more than a suspicion and did not raise probable

16   cause or a preponderance of the evidence that this cash was

17   connected to illegal drug activity.

18         I understand that the cash we're talking about was

19   not totally the only factor being looked at because her

20   husband had already been stopped.  Her husband wanted to get

21   in touch with her.  She had it and I understand it was packed

22   a little bit differently, but not to the extent that it was

23   covered up with -- I think she had a paper clip on it.  It was

24   not covered up with any tape or things like that that would

25   try to keep the smell of drugs away from the drug dogs that

1    they have.

2            I've already referred to the <u>Rooker-Feldman</u>

3    doctrine.  It doesn't help him.  That doctrine applies only

4    when the plaintiff complains of injury from the state court

5    judgment.  Here Julie is not complaining about injury from the

6    state court judgment.  She is complaining about injury arising

7    from the seizure of the cash.  <u>Exxon Mobil Corporation against</u>

8    <u>Saudi Basic Industries Corp.</u>, 544 U.S. 280, 125 S. Ct. 1517,

9    2005.

10            Regarding Count 3, this claim I've already said is

11    barred by the doctrine of qualified immunity, and I referred

12    you to the two cases, <u>United States v. Gholston</u>, 993 F. Supp.

13    2d 704, 711, Eastern District of Michigan, 2014, and it goes

14    to the fact that you cannot without a warrant get to the

15    numbers being called or received on the cell phone.  But that

16    case came out after the events of this matter.  That came out

17    in <u>Riley against California</u>, 134 S. Ct. 2473 at 2488-92, 2014,

18    which I said police may not search the cell phone of an

19    arrestee even, and she wasn't under arrest, without a warrant.

20            Regarding Counts 4 and 5, I've referred to those.

21    Those go to the affidavit.  These are the claims against Mike

22    Stephens.

23            Probable cause is defined as a reasonable grounds

24    for belief supported by less than prima facie proof, but more

25    than mere suspicion.  The grounds for gaining a search warrant

1   need not be perfect or provide every specific piece of

2   information to be upheld.  In a civil rights case an officer

3   is entitled to rely on a judicially secured arrest warrant as

4   satisfactory evidence of probable cause unless an officer

5   knowingly makes false statements or admissions that materially

6   affect the probable cause determination.  Then the officer may

7   be held liable if the affidavit contains false statements or

8   those made in reckless disregard of the truth.  The officer is

9   not required to independently investigate every claim of

10  innocence.  And just bear with me a minute.

11       Well, yeah.  Plaintiffs' primary assertion is that

12  the affidavit does not establish probable cause or that

13  Stephens failed to fully consider other possibilities.

14  However, none of these arguments provide a basis for

15  concluding that the affidavit did not establish probable

16  cause.  Once probable cause is established, an officer has no

17  duty to investigate more or look for evidence that is

18  exculpatory.  That's <u>Kentucky against Young</u>, 51 F. App'x 543,

19  546, Sixth Circuit, 2002.

20       A problem with plaintiffs' argument is that they

21  merely disagree, as I said earlier, with Stephens' conclusions

22  and fail to undermine the affidavit showing probable cause.

23  The alleged conduct of sending false letters could reasonably

24  be attributed as they were attributed.  And once again I

25  failed to identify specific false statements with a possible

1   exception now of the post office, but that is a very minor

2   thing in my judgment.  They go to the reasonableness of the

3   conclusions that could be drawn from the affidavit, and those

4   reasonable conclusions are not drawn by the officer himself.

5   Those reasonable conclusions are drawn by the judicial officer

6   issuing the warrant.

7        And as I've said, then you run into the good faith

8   exception.  That is, even if the warrant is bad, if the

9   officer relied upon it in good faith and he had all the

10   relevant facts in there, then he cannot be held responsible.

11        Count 5, same rationale as I had on Count 4.

12        The conversion claim against Coon is dismissed

13   because it's undisputed that he left the Sheriff's Central

14   Enforcement Team in 2013.  There's no allegation that he

15   personally possessed the money or the cell phone at the time

16   of the alleged conversion.

17        In addition, he's entitled to governmental immunity

18   on the conversion claim.  Number one, the acts were undertaken

19   during the course of his employment.  He performed the --

20   number two, he performed the acts in good faith and without

21   malice.  And three, the acts were discretionary as

22   distinguished from ministerial.

23        Regarding Count 8, Jesse alleges that the search

24   warrant in 2012, that many items were not returned.  This is

25   the count against Nathan Edwards.  It's undisputed that

1    Edwards did not execute the search warrants.  Even if he had,

2    the property by state law is in the custody of the seizing

3    agency.  M.C.L. Section 333.7532(2).

4              He delivered them to the premises to be searched.

5    Furthermore, after keeping the property for a brief while --

6    he got them from the premises to be searched.  Furthermore,

7    after keeping the property for a brief while in the Michigan

8    State Police temporary storage, the property was delivered to

9    and maintained in a secure storage area to which Edwards did

10   not have direct access.

11             Also, plaintiffs never asked anyone to return their

12   property or moved in state court for return of the property.

13   As I understand it, at least, the property has now been

14   returned to plaintiffs, but that's not dispositive in this

15   particular thing.

16             M.C.L.A. Section 780.655 does not help plaintiffs.

17   It governs an officer in execution of a search warrant

18   regarding property or anything covered by a search warrant.

19   It is the seizing agency, as I said earlier, that is

20   responsible, not the officer.

21             And with your permission, Mr. Bostic, I'm going to

22   strike Count 9, the exemplary damages, just to keep the record

23   clear, understanding that you have a right to request that if

24   it goes to trial.

25             MR. BOSTIC:  It is derivative of what's left now,

1    would be Counts 1 and 2.

2              THE COURT:  Right.

3              MR. BOSTIC:  And it's merely derivative.  I did stop

4    doing that as separate counts for awhile.

5              THE COURT:  Yeah.

6              MR. BOSTIC:  Some of the judges preferred it.

7              THE COURT:  Really?

8              MR. BOSTIC:  Because of the heightened element of

9    proof for the exemplary.  But it's --

10             THE COURT:  Okay.  It's there.  No matter -- I'm not

11   going to strike it.  We'll leave it there, and I'm just going

12   to slide it in my own mind from Count 9 to request for

13   relief.  How is that?

14             MR. BOSTIC:  That's understood, Your Honor.

15             THE COURT:  All right.  Anything from the parties

16   here?

17             MS. DENSHAM:  No, Your Honor.

18             MR. FROEHLICH:  No, thank you, Your Honor.

19             MS. VOGLER:  No, thank you.  I had some concern

20   about August 17th, but to the extent that Count 8 has been

21   dismissed, that eliminates the need for me to worry about our

22   final pretrial.

23             THE COURT:  Yes.

24             MR. BOSTIC:  Nothing from the plaintiffs, Your

25   Honor.

1          THE COURT:  All right.  Thank you.  Okay.  We're

2    adjourned.  Thank you.

3          MR. BOSTIC:  Thank you, Your Honor.

4          MS. VOGLER:  Thank you.

5            (Proceedings concluded at 2:55 p.m.)

6                     *     *     *

7                CERTIFICATE OF REPORTER

8

9          I, Kevin W. Gaugier, Official Court Reporter for the

10   United States District Court for the Western District of

11   Michigan, appointed pursuant to the provisions of Title 28,

12   United States Code, Section 753, do hereby certify that the

13   foregoing is a true and correct transcript of the proceedings

14   had in the within-entitled and numbered cause on the date

15   hereinbefore set forth.

16          I do further certify that the foregoing transcript

17   was prepared by me.

18

19

20

21   /s/  Kevin W. Gaugier

22   Kevin W. Gaugier, CSR-3065
     U.S. District Court Reporter
23   110 Michigan N.W.
     622 Federal Building
24   Grand Rapids, MI 49503

25