# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  | 100 EAST FIFTH STREET, ROOM 540 |  |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed:  January 17, 2018

Mr. J. Nicholas Bostic
909 N. Washington Avenue
Lansing, MI 48906

Mr. Joseph T. Froehlich
Office of the Attorney General of Michigan
P.O. Box 30736
Lansing, MI 48909

Re: Case No. 17-1072, *Julie Peffer, et al v. Mike Stephens, et al*
Originating Case No. : 1:15-cv-00078

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Thomas Dorwin

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0013p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────

JULIE PEFFER; JESSE PEFFER,

*Plaintiffs-Appellants,*

*v.*

MIKE STEPHENS,

*Defendant-Appellee.*

> No. 17-1072

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:15-cv-00078—Gordon J. Quist, District Judge.

Decided and Filed: January 17, 2018

Before: BOGGS, BATCHELDER, and BUSH, Circuit Judges.

─────────────

**COUNSEL**

**ON BRIEF:** J. Nicholas Bostic, Lansing, Michigan, for Appellants. Joseph T. Froehlich, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

─────────────

**OPINION**

─────────────

JOHN K. BUSH, Circuit Judge. This appeal requires us to determine the extent of the Fourth Amendment's requirements for an affidavit supporting a warrant to search the residence of an individual suspected of committing a crime involving the use of a computer.

That issue figures prominently in Plaintiffs Julie and Jesse Peffer's appeal of the district court's grant of summary judgment in favor of Defendant Mike Stephens, a detective sergeant

with the Michigan State Police, as to the Peffers' 42 U.S.C. § 1983 claim.  This claim arises from a search of the Peffers' home in Reed City, Michigan, and from the seizure of computer equipment and other items and documents from this residence pursuant to a warrant issued on the basis of Sergeant Stephens's sworn affidavit.  According to the Peffers, the affidavit (which was incorporated into the warrant by reference) failed to support a finding of probable cause for the search and seizure because it did not sufficiently allege any criminal activity or any connection between such activity and the house.

The district court granted summary judgment for Sergeant Stephens, holding that the warrant was supported by probable cause and that, in the alternative, Sergeant Stephens was entitled to qualified immunity.[1]  For the reasons explained below, we affirm.

# I

## A.  Factual Background

Because the district court granted summary judgment, we review the facts "in the light most favorable to the nonmoving party."  *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 301 (6th Cir. 2016).  Briefly stated, the relevant facts are these:

In March 2011, Mr. Peffer met Tom Beemer at Beemer's medical-marijuana dispensary, where Mr. Peffer was purchasing medical marijuana.  By June 2011, Mr. Peffer had become a caregiver for several medical-marijuana patients, for whom he grew marijuana sufficient to cover their medical-marijuana needs.  Based on his understanding of state law, when Mr. Peffer's marijuana plants produced more marijuana than was needed for his patients, he would sell the excess to Beemer to be sold at Beemer's dispensary.[2]

---

[1]The district court did not rule on qualified immunity in those terms exactly, instead holding that the *Leon* good-faith exception applied.  Given that "the same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon* . . . defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest,"  *Malley v. Briggs*, 475 U.S. 335, 344 (1986), we proceed as if the district court had held that qualified immunity applied.

[2]One of the officers involved in Mr. Peffer's arrest contested Mr. Peffer's understanding of Michigan law.  Because it is not germane to the matter before us, we need not resolve this disagreement, nor comment more generally on the legality of Mr. Peffer's trade under state or federal law.

Unbeknownst to Mr. Peffer, Beemer became a confidential informant for both the Central Michigan Enforcement Team and the Traverse Narcotics Team ("CMET" and "TNT," respectively). Beemer attempted to persuade Mr. Peffer to sell him more marijuana than was allowed under the Michigan Medical Marihuana Act, an offer that Mr. Peffer declined. On June 13, 2012, having become suspicious of Beemer's actions, Mr. Peffer agreed to meet with him. While en route, Mr. Peffer was the subject of a traffic stop executed by Officers Coon, King, and Edinger. The officers found fifteen ounces of marijuana in Mr. Peffer's vehicle. At that time, Mr. Peffer had six patients, which he understood to allow him to possess a total of fifteen ounces of marijuana, based on a calculation of 2.5 ounces of marijuana per patient. As of June 1, however, he had only three patients who were medical-marijuana eligible, thereby lowering the quantity of marijuana he could possess under Michigan law to 7.5 ounces. The officers arrested and charged Mr. Peffer with possession with intent to distribute and conspiracy to distribute marijuana.

On February 22 and 25, 2013, the Mecosta Osceola Office of Child Services and the Reed City Public School District received typewritten letters, both dated February 21 and purporting to be from Jason Coon of CMET. Coon was one of the officers who had arrested Mr. Peffer, though he was not identified as such in the letters. Although not identical, the letters were similar in content. They suggested that a Mr. Thomas A. Beemer had been engaged in the distribution of controlled substances but had "in exchange for immunity/leniency in sentencing . . . agreed to become a confidential informant." The letters went on to express concern for the welfare of Beemer's children.

Officer Coon denied writing or sending the letters. Sergeant Lator, who was assigned to investigate the letters, suspected that the sender was someone with whom Officer Coon had interacted during his time assigned to CMET. Based on his CMET experience, Officer Coon thought Mr. Peffer to be the primary suspect. Trooper Glentz, who later assumed responsibility for the investigation, followed up with Officer Coon. The latter justified his suspicion of Mr. Peffer on the grounds that Beemer had been instrumental in setting up a sting operation that resulted in Mr. Peffer's arrest before the suspicious letters were sent, and that Mr. Peffer had lived in Reed City.

Detective West, who assisted in the investigation, identified five possible suspects, two of whom were the Peffers.  Two of the other suspects had been arrested in circumstances similar to Mr. Peffer's, based on information received from Beemer.  The third suspect had been arrested on his way to sell cocaine to Beemer, and, although the record does not directly indicate that Beemer provided information that led to that arrest, the substantial similarities among the four arrests suggest this to be the case.

On March 29, 2014, Trooper Glentz received two packages in the mail, each of which contained what appeared to be marijuana seeds.  The packages had been returned for insufficient postage to Trooper Glentz's residence, which was the return address on the packages.  Trooper Glentz denied that he sent the packages.

On June 16, 2014, in exchange for the prosecutor's dropping the other charges against him, Mr. Peffer pleaded no contest to the making of false pretenses in relation to his June 13, 2012, arrest.

In July 2014, Sergeant Stephens was contacted by Lieutenant Abendroth of CMET, who informed him that a number of fliers of two types had been mailed to businesses and residences in the areas of Grand Rapids and Reed City.  The first type of flier contained a picture of Beemer, identifying him as a confidential informant, an ostensibly official list of charges against Beemer that had been ordered nolle prossed, and a request to contact CMET or TNT should readers have any information concerning Beemer.  The second type of flier contained the same picture and list of charges, but also included the following message: "Hi, my name is Tom Beemer.  I owned a dispensary in Big Rapids and was shut down because of the charges listed below.  Peter Jaklevic as prosecutor set me free.  Please vote for Peter Jaklevic for District Judge.  Friend of criminals."

Lieutenant Abendroth told Sergeant Stephens that he believed that Mr. Peffer had authored the fliers, as well as the earlier letters, because Mr. Peffer was the only individual about whom Beemer had provided information to both CMET and TNT.  Additionally, the original letters had been sent at approximately the same time that Mr. Peffer became aware that Beemer had provided information to the police, and the fliers dated from around the time of Mr. Peffer's

sentencing, which Jaklevic had attended. Because the other three suspects were involved only with CMET, but not TNT, Sergeant Stephens decided not to investigate them further.

On July 31, 2014, Sergeant Stephens obtained a warrant from a magistrate to search a house located at 21271 Bierri Road in Reed City. This residence was owned in fee simple by Mr. and Mrs. Peffer. Sergeant Stephens's affidavit provided details as to the letters that had been sent, the suspected marijuana seeds, the fliers, and the potential connections between Mr. Peffer and the mailings. The warrant authorized the following personal property to be searched for at the house and, if found, to be seized and searched: (1) "records, files, or documents pertaining to Thomas Owen Beemer and his role as a confidential informant and/or dismissal of charges in" certain courts, with "documents" described as including "records or documents which were created, modified . . . or interpreted by a computer" and more specifically identified to include certain computer hardware, computer-related equipment, peripheral and storage devices, software and other items used for computer operation, communication, encryption, and access, as well as electronic mail ("e-mail") and other electronically stored communications or messages; and (2) "[a]ny and all mailing items including but not limited to envelopes, address labels, and stamps that match the items seized in this investigation." The magistrate issued the warrant, finding that probable cause existed for the specified searches and seizures based on the affidavit in which Sergeant Stephens detailed his assertion of probable cause that the house "may contain evidence of the crime of Impersonating a Police Officer and Witness Intimidation." The warrant did not rely on evidence related to marijuana cultivation, possession, or distribution as a basis for finding probable cause for any search or seizure.

On the same day the warrant issued, Sergeant Stephens and five other officers with CMET and TNT executed the warrant on the Bierri Road residence. The officers seized a number of items, including a laptop, two computer towers, two printers, a digital video recorder, an audio recorder, and a number of envelopes, stamps, and papers. After the subsequent investigation of the seized items concluded, prosecutors declined to pursue any criminal charges against the Peffers.

**B. Procedural Background**

On January 28, 2015, the Peffers sued Sergeant Stephens and other defendants, alleging violations of 42 U.S.C. § 1983 stemming from the traffic stop of June 13, 2012, and the home search of July 31, 2014, as well as violations of Michigan law relating to the State's retention of money and goods belonging to the Peffers.

As is pertinent to this appeal, the Peffers alleged that Sergeant Stephens's affidavit lacked facts sufficient to support the magistrate's finding that there was probable cause to search the Bierri Road residence because the affidavit failed to establish that a crime had been committed or that a nexus existed between the alleged crimes and the house, in part because it failed to establish probable cause to believe that Mr. Peffer had committed the alleged crimes. The Peffers further alleged that Sergeant Stephens's reliance on the warrant was unreasonable, rendering qualified immunity inapplicable.

The district court rejected both arguments and granted Sergeant Stephens's motion for summary judgment, and the Peffers timely appealed.

**II**

We review de novo a district court's grant of summary judgment. *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016). Summary judgment is appropriate when "no genuine dispute as to any material fact" exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Fourth Amendment begins: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). Here, the parties do not dispute that a search warrant was required. *See generally Kentucky v. King*, 563 U.S. 452,

459 (2011) ("It is a basic principle of Fourth Amendment law, we have often said, that searches and seizures inside a home without a warrant are presumptively unreasonable.") (internal quotation marks omitted).

Under the Fourth Amendment, a search warrant may be issued only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the . . . things to be seized."  U.S. Const. amend. IV.  Probable cause exists if "the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched."  *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996) (quoting *United States v. Besase*, 521 F.2d 1306, 1307 (6th Cir. 1975)).  "The Fourth Amendment does not require probable cause to believe evidence will *conclusively* establish a fact before permitting a search, but only 'probable cause . . . to believe that the evidence sought *will aid* in a particular apprehension or conviction.'"  *Messerschmidt v. Millender*, 565 U.S. 535, 552 n.7 (2012) (alteration in original) (quoting *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967)).

If a search warrant does not comply with the probable-cause requirements of the Fourth Amendment, 42 U.S.C. § 1983 provides a civil remedy for those whose constitutional rights were violated.  *See, e.g.*, *City of Ontario v. Quon*, 560 U.S. 746, 753–54 (2010).  But state actors are shielded from § 1983 liability for civil damages—that is, they are entitled to qualified immunity—"insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt*, 565 U.S. at 546 (internal quotation marks and citation omitted).

In the context of searches and seizures, "police officers are entitled to rely on a judicially secured warrant for immunity from a § 1983 action for illegal search and seizure unless the warrant is so lacking in indicia of probable cause, that official belief in the existence of probable cause is unreasonable."  *Yancey v. Carroll Cty.*, 876 F.2d 1238, 1243 (6th Cir. 1989).  That is because "the fact that a neutral magistrate has issued a warrant is the clearest indication that the

officers acted in an objectively reasonable manner or . . . in 'objective good faith.'" *Messerschmidt*, 565 U.S. at 546 (quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984)). A magistrate's issuance of a warrant, however, does not always result in qualified immunity: there is "an exception allowing suit when 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue.'" *Id.* at 547 (quoting *Malley*, 475 U.S. at 341).

In a § 1983 action, it is generally the jury's role to determine whether probable cause supported issuance of a search warrant. *Yancey*, 876 F.2d at 1243. A district court therefore should grant a defendant's motion for summary judgment on the basis that a search warrant was supported by probable cause only when the only "reasonable determination" that a jury could make is that probable cause existed. *Ibid*.

The Peffers offer two arguments that the district court erred in holding as a matter of law that Sergeant Stephens's affidavit provided probable cause for issuance of the warrant. In order for Sergeant Stephens's affidavit to have provided probable cause, it must have presented "facts and circumstances . . . such that a reasonably prudent person would be warranted in believing that an offense had been committed *and* that evidence thereof would be found on the premises to be searched." *Greene*, 80 F.3d at 1106 (emphasis added) (quoting *Besase*, 521 F.2d at 1307). The Peffers argue that the affidavit was deficient for failing to satisfy both requirements: they contend that no reasonably prudent person would be warranted in believing based on the affidavit either (1) that a crime had been committed or (2) that evidence of the alleged crime would be found at the Bierri Road residence. We address these arguments below.

### A. The Criminality of the Alleged Conduct

The Peffers argue that the sending of the letters to the Mecosta Osceola Office of Child Services and the Reed City Public School District could not, as a matter of law, constitute commission of the crimes stated in the affidavit—witness intimidation and impersonating a police officer. *See* Mich. Comp. Laws §§ 750.122(3)(a) (witness intimidation) and

750.215(1)(c) (impersonating a police officer).[3] The Peffers contend that Sergeant Stephens therefore violated the Fourth Amendment because the affidavit did not set forth any basis to believe that evidence of criminal activity would be found.

We need not address, however, whether there was a Fourth Amendment violation on the grounds that the affidavit did not properly allege that a crime had been committed. That is because we are convinced that there was no clearly established constitutional violation and therefore qualified immunity applies.

Although we generally determine whether a constitutional violation occurred before we determine whether qualified immunity applies, we need not follow this order of inquiry when determining whether a constitutional violation occurred would require interpreting unsettled state law. *See Pearson*, 555 U.S. at 237–38 (citations omitted). "[W]hen the definition of constitutional rights depends on a federal court's uncertain assumptions about state law," *ibid.*, it makes sense for the federal court to decide the issue of liability on qualified-immunity grounds where, as in this case, the right arising from the determination would not be a clearly established one. *See also Egolf v. Witmer*, 526 F.3d 104, 109–12 (3d Cir. 2008) (declining to address the alleged constitutional violation and holding instead that qualified immunity applied to an arrest for public indecency where "the state law questions underlying the constitutional issues were ones of first impression for the state courts"). Here, we decline to determine whether Sergeant Stephens's reliance on Mich. Comp. Laws §§ 750.122(3)(a) and 750.215(1)(c) caused a constitutional violation, because it was not clearly established that Mr. Peffer's actions as alleged in the affidavit *did not* violate Mich. Comp. Laws §§ 750.122(3)(a) or 750.215(1)(c).

Section 750.122(3)(a) provides that "a person shall not do any of the following by threat or intimidation: discourage or attempt to discourage any individual from attending a present or future official proceeding as a witness, testifying at a present or future official proceeding, or

---

[3]An affidavit sufficiently supports a warrant so long as it provides probable cause to believe evidence of any crime will be found in the location to be searched, even if it does not provide probable cause to believe that evidence of the particular crimes listed in the affidavit will be found in the location to be searched. *United States v. Anderson*, 923 F.2d 450, 457 (6th Cir. 1991) (holding "that knowledge of the precise crime committed is not necessary to a finding of probable cause provided that probable cause exists showing that a crime was committed by the defendants"). Sergeant Stephens does not argue, however, that Mr. Peffer's alleged actions violated any criminal statutes other than Mich. Comp. Laws §§ 750.122(3)(a) and 750.215(1)(c).

giving information at a present or future official proceeding." The Peffers argue that "Defendant Stephens makes no showing that Beemer would have . . . been a witness against [the Peffers] since the charges against them were based on the evidence seized during the traffic stop and/or the evidence seized at their residence" and that when Mr. Peffer pleaded guilty in 2014, it was to false pretenses, a charge about which Beemer knew nothing.

At the time that the letters were sent, Beemer was in possession of information pertaining to the crimes with which Mr. Peffer was charged, making Beemer a potential witness.[4] The Peffers' argument that any testimony that Beemer would have offered at trial was either irrelevant or cumulative with "evidence seized during the traffic stop and/or the evidence seized at their residence" is unconvincing, both because Beemer could have testified to Mr. Peffer's earlier marijuana sales and because there does not appear to be any Michigan precedent suggesting that the intimidation of a potential witness is excused when the testimony of that witness would be cumulative with other evidence potentially introduced at trial.

The Peffers offer no argument beyond their assertion that Mr. Peffer's alleged actions would not constitute a threat or intimidation under Mich. Comp. Laws § 750.122(3)(a). We are not aware of any Michigan case suggesting that, as a matter of law, a defendant could not be convicted under that statute where he has sent a letter to the Department of Child Protective Services pretending to be a police officer, writing that a potential witness "endangered his children by maintaining a 'Drug House' where stock marijuana was stored, prepared, and profits were taken, counted and stashed," and suggesting that the police have "concerns for the minor children."

Nor is it clear that, as a matter of law, Mr. Peffer's alleged actions could not constitute the crime of impersonating a police officer. Mich. Comp. Laws § 750.215(1)(c) prohibits anyone from falsely representing "to another person that he or she is a peace officer . . . with the intent to compel the person to do or refrain from doing any act against his or her will." The Peffers assert that "[t]he letters do not attempt to compel or dissuade anyone from going against their own free will" and could not therefore be violative of § 750.215(1)(c).

---

[4] Mr. Peffer was originally charged with possession with intent to distribute and conspiracy to distribute marijuana, and he did not plead to false pretenses until almost two years later.

Nonetheless it is clear that the letters were attempting, through deception, to elicit a response from the recipients that they otherwise would not freely undertake.  The letter to the Reed City Public School District says that "[a]lthough there hasn't been any credible threat, I felt you should be informed, as to take any and all necessary precautions."  And the letter to the Mecosta Osceola Office of Child Services says, "There are concerns for the minor children. Your help in addressing this issue will be greatly appreciated."

It is an open question of Michigan law whether a private citizen writing under the guise of a police officer to request an official to perform an official action constitutes an attempt to "compel" action under § 750.215(1)(c).[5]  We therefore cannot say that it is clear that Michigan courts would find that a request from a (purported) police officer to assist minor children in (imagined) danger is not, as a matter of Michigan law, an attempt to "compel" the recipient of the request to act.

Accordingly, we hold that even if the sending of the letters were not criminal under Mich. Comp. Laws §§ 750.122(3)(a) and 750.215(1)(c), the law on this point was not clearly established.  Sergeant Stephens thus would be protected by qualified immunity from liability for executing an otherwise valid search warrant seeking evidence that Mr. Peffer violated those criminal statutes.

### B.  The Nexus Between the Evidence Sought and the Bierri Road Residence

We next turn to the Peffers' contention that the warrant was constitutionally defective because the affidavit failed to present facts sufficient to establish that "evidence thereof would be found on the premises to be searched."  *Greene*, 80 F.3d at 1106 (quoting *Besase*, 521 F.2d at 1307).

---

[5]There is a single unreported case from the Michigan Court of Appeals discussing this issue, but it is not dispositive, in part because it analyzed an earlier version of that statute, which prohibited a person falsely representing himself as a police officer from taking "it upon himself to . . . require any person to aid or assist him or her in any matter pertaining to the duty of a . . . police officer."  *Owen v. Unadilla Twp.*, No. 206769, 1999 WL 33451605, at *2 n.3 (Mich. Ct. App. Apr. 9, 1999).

### 1. The Nexus Between Mr. Peffer and the Mailings

The Peffers first argue that there was no connection between evidence of the mailings and the Bierri Road residence by contending that Sergeant Stephens's affidavit fails to lay out a sufficient basis for the magistrate's finding of probable cause that Mr. Peffer was the sender of the various mailings. Because the affidavit alleges Mr. Peffer as the only link between the mailings and the Bierri Road residence, if there was no probable cause to believe that he originated the mailings, there would be no probable cause to believe that evidence of the mailings would be found at the Bierri Road residence. The Peffers raise a number of points in support of this claim, two of which warrant discussion.

They begin by suggesting that Sergeant Stephens's inclusion in the affidavit of the statement that "Det. Coon informed D/Sgt. Lator that he suspected Jesse Lee Peffer . . . as being the author and sender of the letters based on his CMET experience and contacts" was nothing more than the "unsupported conclusion[] of Defendant Coon" and that "no facts . . . were attested to so that the magistrate could draw his own conclusion."

Although the Peffers may be correct that Detective Coon's suspicion, unsupported by an articulation of its basis, would be insufficient to support a finding of probable cause,[6] it does not follow that because *this* paragraph in the affidavit cannot provide probable cause to believe that Mr. Peffer was the originator of the mailings, the affidavit as a whole fails to do so. *See United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004) ("The affidavit should be reviewed in a commonsense—rather than a hypertechnical—manner, and the court should consider whether the totality of the circumstances supports a finding of probable cause, rather than engaging in line-by-line scrutiny.").

Taken as a whole, the affidavit clearly supports the magistrate's finding of probable cause to believe that the mailings originated with Mr. Peffer. Specifically, Sergeant Stephens averred: (1) Beemer had provided information that led to Mr. Peffer's arrest; (2) the letters naming Beemer had been sent after Mr. Peffer's arrest; (3) the fliers, which specifically named a

---

[6]*See, e.g.*, *United States v. Giacalone*, 541 F.2d 508, 513 (6th Cir. 1976) (en banc) ("[P]robable cause is a showing of more than suspicion but less than guilt.").

prosecutor who had been present at Mr. Peffer's sentencing, had been sent within two weeks of said sentencing; (4) Trooper Glentz received the marijuana seeds while he was trying to contact Mr. Peffer; (5) Mr. Peffer was the only person on whom Beemer had informed whom Trooper Glentz had attempted to contact; (6) the fliers asked for any information regarding Beemer to be forwarded to CMET and TNT, and Mr. Peffer was the only individual in the counties targeted by the mailings who had been charged with crimes stemming from interactions with both CMET and TNT; and (7) the mailings had been postmarked from Grand Rapids, which is the central sorting facility for the area where the Bierri Road residence is located.[7] We agree with the district court that no reasonable jury could fail to find that Sergeant Stephens's affidavit provided "adequate supporting facts about the underlying circumstances to show that probable cause exist[ed]" to connect Mr. Peffer to the mailings. *See Weaver*, 99 F.3d at 1377.

The Peffers next assert that even if the magistrate correctly found that the affidavit provided probable cause to believe that Mr. Peffer was connected with the mailings, Sergeant Stephens was unable to rely on that determination because he included false or misleading statements in the affidavit. They argue that the following three statements (italicized below) are instances of Sergeant Stephens's obfuscation:

(1)    "*The flyers that were recovered with envelopes showed post marks of Grand Rapids, Michigan which is the central sorting facility for the U.S. Postal Service for this area.*" Appellants' Br. 11 (italics added). The Peffers argue that in the context of the affidavit, the phrase "this area" refers to Mecosta County and Osceola County, in which the Bierri Road residence is located. The Peffers argue that mail sent from the Bierri Road residence in Reed City, Osceola County, is actually sorted at the Traverse City sorting facility, which would indicate that the mailings were not sent from the Bierri Road residence.

(2)    "*There are similarities in content and format between the various flyers.*" Appellants' Br. 14 (italics added). The Peffers argue that this statement is misleading because there are a number of differences between the individual fliers as well as between the fliers and the letters, including their addressees, content, and formatting.

---

[7]To the extent that the Peffers contend that Sergeant Stephens came by these facts not through direct investigation but instead through the investigations of other officers, we note that "supporting facts need not be based on the direct knowledge and observations of the affiant." *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1998).

(3)  "*Jesse Peffer told Dep. Start that he resides at the residence alone and that Julie lives in Florida.*"  Appellants' Br. 16 (italics added).  The Peffers argue that this statement was misleading because Sergeant Stephens failed to include the fact that Mr. Peffer's attorney had earlier told Trooper Glentz that Mr. Peffer was residing in Florida.

In order to prove that Sergeant Stephens could not rely on the magistrate's finding of probable cause, the Peffers would need to show both that Sergeant Stephens "knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions that create[d] a falsehood," and that "such statements or omissions [we]re material, or necessary, to the finding of probable cause."  *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (alterations in original) (citing *Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000)).  They are unable to make this showing for any of the statements.

Taking the evidence in the light most favorable to the Peffers, Sergeant Stephens's statement that "Grand Rapids, Michigan . . . is the central sorting facility for the U.S. Postal Service for this area" was intended to convey to the magistrate that Grand Rapids was the central sorting facility for the area including the Bierri Road residence.  But mail sent from Reed City is actually sorted through the Traverse City sorting center, which services an area adjacent to that serviced by the Grand Rapids sorting center.

Regardless of the truth value of Sergeant Stephens's statement, no reasonable jury could have found that it was material to the magistrate's determination that there was probable cause to believe that Mr. Peffer was the originator of the mailings.  As discussed above, the affidavit established a motive unique to Mr. Peffer for sending the mailings as well as a temporal proximity between the mailings and the motivating incidents.  That the mailings originated from the geographical area serviced by the neighboring postal sorting center, which is easily accessible from the Bierri Road residence, would not materially impact the determination that there was probable cause to believe that Mr. Peffer had mailed the letters.

The Peffers next charge that Sergeant Stephens was disingenuous in asserting that the fliers were similar.  But the fliers are, in fact, similar.  They name Beemer as a confidential informant, they list the counts with which he was charged, they are typed in the same, or very similar, fonts, and they contain what appear to be versions of the same picture of Beemer.  They

are also similar to the letters that had been sent earlier because all the non-marijuana mailings named Beemer as a confidential informant and were computer-generated.   Accordingly, Sergeants Stephens's statement that "[t]here are similarities in content and format between the various fliers" is not false.

The Peffers argue that the statement was nevertheless misleading for failing to mention the differences between the mailings, including that the *letters* were addressed to specific entities, purported to be from Officer Coon, and were non-political, whereas the *fliers* were not addressed to specific entities (but were mailed to specific entities), were political, and did not purport to be from Officer Coon.[8]

Sergeant Stephens could not have been exhibiting a reckless disregard for the truth when he failed to mention these differences in his statement that the fliers share certain similarities, because elsewhere in the affidavit he provided detailed descriptions of the mailings which, when compared, reveal that they differ exactly in the respects described by the Peffers.   Sergeant Stephens's statement that the fliers are similar is properly read as a conclusory summary of his earlier descriptions, which contained all the relevant information to which he had access, and not as a standalone statement that, if read in isolation, was potentially misleading.

The Peffers further contend that although the statement that "Jesse Peffer told Dep. Start that he resides at the residence alone and that Julie [Peffer] lives in Florida" is true, it misled the magistrate by failing to mention that Mr. Peffer's attorney had told Trooper Glentz that Mr. Peffer was residing in Florida.   The statement to Trooper Glentz was made on April 4, 2014, almost four months before Mr. Peffer told Deputy Start in person that he resided at the Bierri Road residence.   Other than the mere fact that Sergeant Stephens omitted the earlier statement, the Peffers have offered no evidence that Sergeant Stephens's omission was borne of an intent to deceive or of recklessness as to such deception.   Even when an affiant has omitted information critical to the finding of probable cause, we have expressed reticence to infer intent or recklessness without evidence beyond the omission itself.   *See United States v. Colkley*, 899 F.2d 297, 301 (6th Cir. 1990).

---

[8]The Peffers' brief also references a chart listing minor, but immaterial, grammatical differences among the various mailings.

But even if it is possible that a reasonable jury could, in light of the false statement regarding the sorting center, conclude that this omission was part of a general attempt to mislead the magistrate as to the likelihood that Mr. Peffer had been in the relevant areas at the relevant times, the Peffers cannot show that this omission was material to the magistrate's conclusion that there was probable cause to believe that the mailings originated with Mr. Peffer.  Whether or not Mr. Peffer spent part of his time in Florida, it is uncontested that he spent part of his time in Michigan, which would have afforded him ample opportunity to dispatch the mailings.

### 2. *The Nexus Between the Mailings and the Bierri Road Residence*

Finally, the Peffers argue that even if the affidavit presented facts sufficient for a reasonably prudent person to believe that Mr. Peffer had sent the mailings, it lacked sufficient facts to support a reasonably prudent person in believing that evidence of those mailings would be found at the Bierri Road residence.  They base this argument on the general lack of evidence presented in the affidavit connecting the mailings with the Bierri Road residence, and specifically on the fact that no assertion was made that Mr. Peffer owned either a computer or a printer or, if he did, that he kept those items at the Bierri Road residence.

Sergeant Stephens argues that the magistrate was reasonable in finding a connection between the Bierri Road residence and the items to be sought because the affidavit reported that the letters and fliers appeared to be computer-generated, and that based upon Sergeant Stephens's training and experience, evidence of those documents was likely to be found on an electronic storage device, which he argues would likely be kept at its owner's residence.

Because probable cause depends upon the belief of an idealized reasonably prudent person, "whether an affidavit establishes a proper nexus is a fact-intensive question resolved by examining the totality of circumstances presented."  *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016).  The fact-intensive nature of the inquiry "has resulted in a wide river of cases that courts have sought, sometimes in vain, to direct into tributaries that may be applied to comparable fact patterns."  *Id*. at 381–82.

Our analysis of the instant case starts at the river's source—cases in which an affidavit establishes probable cause to believe that a resident of the place to be searched has committed a

crime, but provides no further indication that evidence of that crime will be found at the domicile.  We long ago determined that in order to support a finding of probable cause, "the affidavit must suggest that 'there is reasonable cause to believe that the specific "things" to be searched for and seized are located on the property to which entry is sought' and not merely 'that the owner of property is suspected of crime.'"  *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)).

The requirement that there be additional reason to think that evidence of the crime will be found in the criminal's residence is not as onerous as it may appear.  A magistrate may infer that the evidence sought is likely to be found in the criminal's residence based on "the type of crime being investigated, the nature of the things to be seized . . . and the normal inferences that may be drawn as to likely hiding places," and "it is reasonable to suppose that some criminals store evidence of their crimes in their homes, even though no criminal activity or contraband is observed there."  *United States v. Williams*, 544 F.3d 683, 686–87 (6th Cir. 2008).

It appears to be a question of first impression in this circuit whether the nature of a computer is such that its use in a crime is alone sufficient to justify an inference that, because of "the nature of the things to be seized," *ibid*., evidence of the crime is likely to be found in the alleged criminal's residence.  But this question is not a difficult one to answer based on basic principles.

As a general rule, it is reasonable, *ceteris paribus*, to assume that a person keeps his possessions where he resides.[9]  This presumption is of course rebuttable and cannot always be relied upon by a magistrate in finding a nexus between the object used in a crime and the alleged criminal's residence, because the "totality of circumstances presented" in the affidavit may suggest that the object is more likely to be found elsewhere or nowhere at all.  *Brown*, 828 F.3d at 382.  The affidavit may, for example, include evidence suggesting that the object was not owned by the alleged criminal; that it was discarded, sold, or was otherwise disposed of; that the

---

[9]*See, e.g.*, *United States v. Aljabari*, 626 F.3d 940, 946 (7th Cir. 2010) ("When probable cause exists to believe an individual has committed a crime involving physical evidence, and when there is no articulable, non-speculative reason to believe that evidence of that crime was not or could not have been hidden in that individual's home, a magistrate will generally be justified in finding probable cause to search that individual's home.").

alleged criminal, while retaining possession of the object, stores it elsewhere than his residence; or that the object no longer exists.

If an affidavit presents probable cause to believe that a crime has been committed by means of an object, however, a magistrate may presume that there is a nexus between that object and the suspect's current residence, unless the affidavit contains facts that may rebut that presumption.[10]

And although we have not articulated this presumption in precisely this manner, it underlies our previous decisions in cases analyzing the connection between the objects used in a crime and the alleged criminal's residence. Our jurisprudence in this area has not always been as clear as one might hope, but an analysis of several of our nexus-jurisprudence tributaries shows that it is not as muddled as one might fear.

When it comes to guns, because we "have acknowledged that individuals who own guns keep them at their homes," *United States v. Smith*, 182 F.3d 473, 480 (6th Cir. 1999), a suspect's use of a gun in the commission of a crime is sufficient to find a nexus between the gun that was used and the suspect's residence. For example, in *United States v. Vanderweele*, an informant told an ATF agent that he had seen Vanderweele in possession of a silencer at a clubhouse. 545 F. App'x 465, 467 (6th Cir. 2013). The agent sought a search warrant for Vanderweele's residence based on nothing more than the informant's statement that Vanderweele had been in possession of a silencer and his awareness, "based on his training and experience, 'that firearms, ammunition, and related items are commonly stored within the owner or possessor's dwelling.'" *Id.* at 469. We held that based on these alleged facts, "[t]he magistrate judge had reason to believe that the silencer would be found at Vanderweele's house," and we upheld the warrant. *Ibid*.

This is consistent with our holdings in similar cases.[11]   *See, e.g.*, *United States v. Goodwin*, 552 F. App'x 541, 546 (6th Cir. 2014) (upholding a warrant to search illegal-gun

---

[10]As with all findings of probable cause, this presumption is subject to a staleness analysis. The Peffers did not argue that any probable cause established in the affidavit had gone stale.

[11]It is also consistent with the approach taken by many, but not all, of our sister circuits. *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988) ("It was reasonable for the magistrate to believe that the defendant's

purchaser's residence where an affidavit established that the gun sought was valuable and that "owners usually keep machine guns in their homes"); *United States v. Cobb*, 397 F. App'x 128, 133 (6th Cir. 2010) (upholding a warrant to search bank robber's residence for the clothing and gun he had used during a robbery because the "reasonable inference is that this clothing and gun likely would have been in [defendant's] possession six weeks following the final robbery").[12]

It is clear that the use of a gun in the commission of a crime is sufficient to establish a nexus between the suspected criminal's gun and his residence. Computers are dissimilar to guns in many ways, including the nature of the crimes in which they are used and the relative ease with which guns can be transported and discarded. Computers are similar to guns, however, in that they are both personal possessions often kept in their owner's residence and therefore subject to the presumption that a nexus exists between an object used in a crime and the suspect's current residence. This is borne out by our cases involving the consumption of child pornography via computer.

Although we have never been asked to pass judgment on a magistrate's finding of a nexus between the computer used to consume child pornography and the alleged consumer's

---

gun and the silencer would be found in his residence . . . even though the affidavit contained no facts that the weapons were located in defendant's trailer."); *United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975) (upholding a warrant on the basis that "people who own pistols generally keep them at home or on their persons"); *United States v. Rahn*, 511 F.2d 290, 293–94 (10th Cir. 1975) (upholding a warrant because "it is reasonable to assume that [defendant's] house was where he kept things and it is pretty normal . . . for individuals to keep weapons in their homes"); *Bastida v. Henderson*, 487 F.2d 860, 863 (5th Cir. 1973) (upholding a warrant because a "reliable informant stated that on the day after the robbery [Defendants] were still armed with automatic pistols" and "[a] very likely place to find them thereafter would either be on the persons of the assailants or about the premises where they lived"). *But see United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir. 1979) (invalidating a warrant because there was "nothing in the affidavit from which a factual finding could be made that the gun used in the shooting was probably located at defendant's premises" and "[c]ommon sense tells us that it is unlikely that a murderer would hide in his own home a gun used to shoot someone").

[12]This area of our jurisprudence is admittedly murky. In *United States v. Bethal*, the panel declined to find a nexus between the gun defendant used in a shooting and his residence, despite the affidavit's asserting that the defendant had been "identified as one of the drive-by shooters." 245 F. App'x 460, 469 (6th Cir. 2007). Over a dissent, the panel reasoned that because "persons accused of murders often dispose of the guns utilized in the crime soon afterward" and "the affidavit . . . provided no indication that at the time of the search, [Defendant] was still participating in gang-related shootings, or was seen carrying a gun," the affidavit failed "to establish any relationship between [Defendant]'s residence and the fair probability that weapons and drugs would be found there." *Id.* at 468–69. We question *Bethal*'s emphasis on ongoing criminal conduct and are not bound by this unreported decision. *See United States v. Ennenga*, 263 F.3d 499, 504 (6th Cir. 2001) ("We need not concern ourselves with any perceived inconsistency, however, because [*inconsistent case*] is an unpublished case and therefore not a controlling precedent.").

residence based on nothing more than the use of the computer, we have placed our imprimatur on a number of search warrants issued based on affidavits with scant evidence supporting a nexus beyond the use of a computer.  *See, e.g.*, *United States v. Elbe*, 774 F.3d 885, 890 (6th Cir. 2014) (finding that affidavit established nexus because the suspect's residence had high-speed internet and the suspect had been observed using a laptop on his front porch); *United States v. Lapsins*, 570 F.3d 758, 766 (6th Cir. 2009) (finding that affidavit established nexus because the IP address used to distribute prohibited material was accessed by a residential modem located in the general vicinity of suspect's residence and that suspect had participated in an online chat regarding prohibited material between the hours of 6:30 and 8:30 a.m., when suspect would be at home); *United States v. Terry*, 522 F.3d 645, 648 (6th Cir. 2008) (finding nexus because affidavit established that the suspect had a computer at his residence and had sent an email containing prohibited material at approximately 2:30 a.m.).

Just as guns, and other possessions, are generally kept in the home, so too are computers, and so we readily find a nexus between computers used in the consumption of child pornography and the suspected consumer's residence.

The principle that we are now articulating also explains why we are more reticent to find a nexus between drugs and their distributor's residences.   In *Brown*, the defendant was apprehended leaving the location of a sale of more than 500 grams of heroin, and was found to be in possession of $4,813 in currency. 828 F.3d at 378–80.  Responding to the Government's argument that "the magistrate judge was entitled to infer that evidence of drug trafficking would be found at Brown's residence because he was a known drug dealer," we pointed out that "we have never held . . . that a suspect's status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home."  *Brown*, 828 F.3d at 383.  Recognizing that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live," we nevertheless held that "if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." *Id.* at 383–84.

This is because, unlike guns and computers that are used in the commission of a crime, when drugs are used in the commission of a distribution offense, the distributed drugs are no longer in the possession of the suspected distributor. The affidavit therefore must establish some other reason to believe that drugs or other evidence of crime would be found in the suspect's residence if searched. *See, e.g.*, *United States v. Raglin*, 663 F. App'x 409, 411–12 (6th Cir. 2016) (finding nexus because affidavit established that a suspect drove to the defendant's house directly after trafficking drugs, at which point $38,000 appeared in a purse on the roof and the defendant's girlfriend told officers that guns were in the house); *United States v. Kenny*, 505 F.3d 458, 461 (6th Cir. 2007) (finding probable cause because affidavit established that an informant identified the defendant as the "cook" of a large ongoing trafficking operation that was taking place on his property, which was corroborated by independent evidence); *United States v. Newton*, 389 F.3d 631, 636 (6th Cir. 2004) (explaining that affidavit established that defendant was engaged in a "continual and ongoing" drug distribution scheme), *rev'd on other grounds*, 546 U.S. 803 (2005); *United States v. Jones*, 159 F.3d 969, 974 (6th Cir. 1989) (finding that affidavit established that defendant was seen distributing narcotics directly outside of his domicile). Unlike drugs, guns and computers are objects that generally remain in the suspect's possession after commission of the crime, and therefore it is reasonable to believe those possessions to be stored at the suspect's residence, absent evidence to the contrary.

Here, the affidavit included allegations that Mr. Peffer had used a computer in the commission of his crime, that evidence of the crime would likely be found on that computer, and that Mr. Peffer resided at the Bierri Road residence, thereby establishing a presumption that evidence of the crime would be found at the Bierri Road residence. That the affidavit did not allege that Mr. Peffer owned a computer or that he kept one at the Bierri Road residence is immaterial, because the averment that he used one in the commission of a crime is sufficient to create the presumption that it would be found at his residence. *See e.g.*, *Vanderweele*, 545 F. App'x at 469. The affidavit did not suggest any reason to believe that Mr. Peffer had used a computer that did not belong to him, that he had thrown out or otherwise disposed of the computer, or that he kept the computer elsewhere. Indeed, the affidavit did not suggest any reason to believe that the computer used in the commission of the crime would not be found at

the Bierri Road residence, and therefore the only reasonable conclusion that a jury could draw is that a nexus existed between the evidence sought and the Bierri Road residence.

Because Sergeant Stephens executed a valid warrant supported by probable cause as to a connection between the mailings and the Bierri Road residence, when he searched that house, there was no Fourth Amendment violation on this ground. Because there was no constitutional violation, we need not address the second step of the qualified-immunity analysis, whether the law was clearly established.

### III

For the forgoing reasons, we **AFFIRM**.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 17-1072

JULIE PEFFER; JESSE PEFFER,
     Plaintiffs - Appellants,

    v.

MIKE STEPHENS,
     Defendant - Appellee.

**FILED**
Jan 17, 2018
DEBORAH S. HUNT, Clerk

Before:  BOGGS, BATCHELDER, and BUSH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk